# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 19, 2016

## JAMES ROBERT WILSON v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Davidson County
### No. 98-D-3052     Steve Dozier, Judge
_____

### No. M2016-00860-CCA-R3-HC – Filed November 2, 2016
_____

A Davidson County jury convicted the Petitioner, James Robert Wilson, of especially aggravated robbery and first degree felony murder, and the trial court sentenced him to an effective sentence of life in prison. The Petitioner appealed, and this Court affirmed the trial court's judgments. *State v. James Robert Wilson*, No. M2000-00760-CCA-R3-CD, 2002 WL 1050259, at *1 (Tenn. Crim. App., at Nashville, May 24, 2002), *perm. app. denied* (Tenn. Nov. 12, 2002). In 2003, the Petitioner unsuccessfully sought post-conviction relief. *James Robert Wilson v. State*, M2004-00933-CCA-R3-PC, 2005 WL 1378770, at *1 (Tenn. Crim. App., at Nashville, June 10, 2005), *perm. app. denied* (Oct. 31, 2005). In 2016, the Petitioner filed a petition for habeas corpus relief contending that the trial court "constructively amended the indictment in this case" when it charged the jury using language that did not fully comport with the language used by the grand jury when it indicted him. The habeas corpus court summarily dismissed the petition, and we affirm the habeas corpus court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

James Robert Wilson, Only, Tennessee, Pro Se.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Glenn R. Funk, District Attorney General; and J. Wesley King, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

In our opinion disposing of the Petitioner's direct appeal, we summarized the facts presented at trial:

On November 13, 1997, Timothy Wayne Holt (also known as Timbo) was fatally shot three times in the back of the head inside his home located at 713 Oneida Avenue in Nashville. The proof at trial revealed that the victim was a well-known local marijuana dealer and merchant of stolen property. At the time of his death, the victim was married to Julie Holt, and the couple had a four year old son, Blake Holt. The couple maintained two residences, one at 713 Oneida Avenue, and another at 211 Archwood Drive in Madison. Mrs. Holt explained that the couple maintained two residences so that her husband could conduct his drug and stolen property business on Oneida street, while the family slept at their apartment in Madison.

Timbo employed many security devices at the Oneida residence. The home was equipped with a deadbolt lock, security system, and metal security gates on the front and rear door. Mrs. Holt testified that Timbo always kept the doors locked when he was inside. Timbo also kept a pit bull and a boxer for protection. Mrs. Holt testified that both dogs were very protective of the victim and would bark and become fierce when a strange person approached the home. On November 13, 1997, Mrs. Holt and her infant son arrived at the Oneida residence at approximately 7:00 p.m. When she arrived, Timbo was in the process of selling marijuana to a frequent customer, Derek Larkin (also known as Bushrod). Mrs. Holt testified that Bushrod purchased an ounce from Timbo, which Timbo measured by piecing it from a larger brick of marijuana. She stated that Timbo normally stored the brick of marijuana in a large black trash bag in the trunk of a car behind the home. Timbo stored marijuana in three (3) separate locations: (1) in ziplock bags inside the dog food; (2) inside his son's toys in the backyard; and (3) in the trunk of the car parked behind the house. Timbo stored the trunk's key in the top dresser drawer in the master bedroom. Mrs. Holt testified that Bushrod paid Timbo and then left. She also testified that the dogs did not like Bushrod, and often barked when he came to the house. Bushrod's testimony corroborated Mrs. Holt's account of the events on that night. She also testified that Timbo's pit bull usually barked when he was there.

Approximately fifteen minutes after Bushrod left, Mrs. Holt and the baby left to attend a wrestling match. She returned to the Oneida residence approximately two hours later at 9:00 p.m. She stated that although Timbo was not home, she paged him and he arrived at the Oneida residence thirty

minutes later. Mrs. Holt testified that [the Petitioner] called the Oneida residence later that night. She stated that she knew that it was the Petitioner because when she answered the phone he identified himself as "B.J." or "Black James." She overheard Timbo and [the Petitioner] discussing a .40 caliber Glock pistol for $400.00. Timbo also informed [the Petitioner] that his brother, Michael Holt was not at his home. Mrs. Holt was well acquainted with [the Petitioner], as he and Timbo were friends and often spent time together. [The Petitioner] had also been a frequent guest at the Oneida residence over the past two years. She recalled that [the Petitioner] often wore a black leather jacket.

Mrs. Holt left the Oneida residence while Timbo was on the phone with [the Petitioner]. As was her common practice, Mrs. Holt called Timbo when she reached the apartment in Madison, at approximately 10:30 p.m. She stated that when she called, the line was busy and although she paged him, Timbo did not respond. Mrs. Holt became alarmed because this was uncommon. She then called Jason Westmoreland, Timbo's "roommate," who often stayed at the Oneida residence. Mr. Westmoreland stated that he had dropped the victim off at the Oneida residence at approximately 10:00 p.m. She then called Michael Holt, the victim's brother, and asked him to check on Timbo.

Timbo's brother, Michael Holt, lived next door at 711 Oneida Avenue with his wife, Shannon Holt, and their infant son. Michael Holt was also known in the neighborhood as a drug dealer and weapons "merchant" and was incarcerated at the time of trial on a felony drug conviction. Michael Holt testified that on November 13, 1997, his family left home at 5:00 p.m., and returned home at approximately 10:00 p.m. As they were pulling into their driveway, his wife noticed that someone had opened the front door of Timbo's home, peered out, and shut the door quickly. Michael Holt testified that at approximately 10:30 p.m., Julie Holt called him upset because Timbo had not returned her calls or pages. Upon her request, he went next door to check on Timbo. He noticed that although all of the interior lights were on, the door was locked and no one appeared to be home. Seeing no signs of forced entry, he returned home. He then telephoned Julie Holt and asked her to bring the keys to the Oneida residence.

Mrs. Holt testified that when she arrived at the Oneida residence, she detected a "burnt smell" as she walked towards the front of the house. As she entered the home, she noticed that the phone was off the receiver. She

3

then discovered Timbo's body laying face-down on the floor of her son's bedroom, and ran next door to get help. When Mrs. Holt returned, she discovered that Timbo was dead.

Mrs. Holt further testified that the day before Timbo was killed, he had purchased five pounds of marijuana from his supplier. When they found the victim's body, he had $13.00 in his pants pocket. She testified that it was common knowledge that the victim often kept cash and marijuana in the house. Timbo often stored the money from his drug sales in the front pocket of a Levi's shirt, that hung in the closet in the master bedroom. On the night he was murdered, Timbo had $2,000.00 in the pocket earlier in the evening, in denominations ranging from $5.00 to $100.00. After an initial inspection, Mrs. Holt discovered that the $2,000.00 was missing. She also noticed that the black trash bag, where Timbo stored the brick of marijuana, was empty on the kitchen table. The key to the trunk of the car where the marijuana was normally stored was also missing, but was later discovered in the passenger seat of the Bronco. However, the victim's stolen radios, and the Holt's [sic] own televisions, VCRs, and jewelry were not disturbed. Mrs. Holt and Michael Holt both testified that everything else in the house seemed to be intact. Although there were no signs of forced entry into the home, it was later discovered that the back door was wide open.

Ms. Lee Carrington, a long-time neighbor, lived at 715 Oneida Avenue. Ms. Carrington testified that on November 13, 1997, at approximately 10:00 p.m., she heard some commotion outside. She testified that the noise sounded like someone banging on a car door three times with a fist. When Ms. Carrington looked out the window, she saw what appeared to be a man standing in the driveway between her and Timbo's home. She then went out on the porch and asked the man if Timbo knew that he was there. The man, who continued to look in the direction of Michael Holt's home, replied emphatically, "ma'am, yes, ma'am; yes, ma'am." She recalled that the man had the voice of an older teenager and was approximately between the ages of nineteen and twenty-one. She testified that he was black and was wearing dark clothing and a large dark bulky jacket that fit slightly below the waist. She observed that the man was standing next to the window of the Bronco, and appeared to be as tall as the window's metal frame. After she turned away, she saw a blur run past her as someone ran through her yard and down Oneida street. She recalled that it was odd that the pit bull in Timbo's backyard did not bark at the man, because he normally barked at strangers. Later, officers measured

4

the Bronco's door frame and it was estimated to be approximately sixty to sixty three inches in height. Michael Holt and Julie Holt each testified that [the Petitioner] was often respectful towards older people and usually answered them by saying, "yes, ma'am" or "no, ma'am."

. . . .

Michael Holt testified that within a few days of his brother's death, he posted signs offering a $10,000 reward for information on his brother's killer. Shortly thereafter, Mr. Burke, the owner of a local pawn shop, gave him two videotapes and a $100.00 bill. Michael Holt later turned this evidence over to police.

Timothy Burke testified that he and Timbo were close friends. Burke gave Michael Holt surveillance video tapes of the pawn shop in an attempt to help him apprehend his brother's killer. In his opinion, anyone who did business with him on the days surrounding Timbo's murder probably did business with Timbo, and he felt that the killer might be on one of the tapes. Mr. Burke also admitted that he gave Michael Holt a $100.00 bill that [the Petitioner] had spent in the pawn shop shortly after Timbo's death. Mr. Burke testified that on November 12 and 13, [the Petitioner] asked him if he could borrow some money. He stated that [the Petitioner] explained that he needed money to buy things for his baby's arrival. He testified that [the Petitioner] also tried to borrow money from several of his customers, however they refused because [the Petitioner] already owed them money. However, on November 14, 1997, [the Petitioner] came into the pawn shop and spent approximately $300.00, and Mr. Burke noticed that [the Petitioner] had much more money in his pocket. When he inquired where [the Petitioner] got the money, [the Petitioner] responded, "I hit a lick," meaning he had made some money. Mr. Burke identified [the Petitioner] in both of the videos that were played in the jury's presence. He testified that the video tapes were recorded on November 12 and 13, 1997. Mr. Burke admitted that the tapes were not formally marked or labeled by date. In the background, [the Petitioner] could be heard asking people for money. [The Petitioner] was also seen wearing a quarter-length black leather coat. He stated that [the Petitioner] frequently wore the coat before November 13, but that he never wore it after that date. Instead, [the Petitioner] began to wear a blue thermal lumber jacket. Mr. Burke also testified that before November 14, 1997, he had seen [the Petitioner] carrying a .357 caliber revolver.

Dr. Bruce Levy, the Medical Examiner for Davidson County, testified on behalf of Dr. Emily Ward, the medical examiner who performed the autopsy on the victim. . . . Dr. Levy testified that . . . the victim died as a result of three gunshot wounds to the head. "Stippling" was noted around two of the three bullet wounds, which indicated that when the gun was fired, the barrel was between approximately six inches to twenty-four inches away from the victim's head . . . . In his expert medical opinion, all of the shots were fatal and would have led to death within a matter of minutes.

Tandra Walker testified that in November of 1997, she was dating and living with her boyfriend, Michael Garcia and his family. She was acquainted with [the Petitioner], who was a friend of Mr. Garcia's. Ms. Walker stated that late one night in 1997, [the Petitioner] appeared at their home unexpected. She testified that Mr. Garcia got up to answer the door while she remained in bed. She stated that she knew it was [the Petitioner] because she heard him talking in the den, located only a few feet from her bedroom. Mr. Garcia then came back in the room and stated that he had to leave with [the Petitioner], although he did not say where they were going. Mr. Garcia returned home later that night and awakened her. She testified that he was acting "strange" and told her that [the Petitioner] had confessed to killing someone. Mr. Garcia also told her that [the Petitioner] had blood on his clothing and that he saw the murder weapon in [the Petitioner]'s car. Early the next morning, between five and six o'clock, the phone rang and Mr. Garcia woke up and turned on the morning news. She stated that the news was reporting about Timbo's murder. She admitted that after this date, they continued to socialize with [the Petitioner] and his girlfriend.

Ms. Walker testified that in the fall of 1998, [the Petitioner] began to make threatening calls to her home. The court then held a jury out hearing to determine whether evidence of the threats and the audio taped calls were admissible. Upon review, the trial court only permitted Ms. Walker to testify of the conversations she had with [the Petitioner]. She testified that in 1998, [the Petitioner] began calling her home looking for Mr. Garcia. The first call was placed on the morning after Mr. Garcia was released from jail. Ms. Walker testified that over the course of two days, she received approximately twenty calls from [the Petitioner]. She stated that although she recorded some of the later calls, she did not tape their initial conversations. Ms. Walker recalled that [the Petitioner]'s tone of voice was often harsh and menacing. She stated that in many of the calls, [the Petitioner] referred to Mr. Garcia as a "Florida ass n----- and homicide ass

n-----." He also threatened to harm Mr. Garcia and Ms. Walker if his calls were unreturned. She tried unsuccessfully to block [the Petitioner]'s calls and finally changed her number to an unpublished listing. At the time of trial, she was still dating Mr. Garcia.

Mr. Garcia testified that he and [the Petitioner] were friends for almost two years. He also knew Timbo, and he knew that [the Petitioner] and Timbo were friends. Mr. Garcia stated that on November 13, 1997, [the Petitioner] appeared at his home late at night. Mr. Garcia was in the bed with his girlfriend, Ms. Walker, when [the Petitioner] knocked on his door. When he answered the door, he noticed something "reddish" on the front of [the Petitioner]'s black leather jacket. He testified that [the Petitioner] was upset, and confessed to killing Timbo. Mr. Garcia then assumed that the red stain on [the Petitioner]'s chest was blood. Although [the Petitioner] wanted to spend the night, Mr. Garcia refused. [The Petitioner] then told Mr. Garcia to come ride with him. He testified that when he looked at [the Petitioner], [the Petitioner] had a "strange" look in his eyes. Mr. Garcia agreed to go because he was afraid that [the Petitioner] would harm him or his family.

When Mr. Garcia got into the car, he saw what appeared to be a .357 revolver in [the Petitioner]'s passenger seat. He testified that [the Petitioner] then drove to [the Petitioner]'s brother's house near Riverside Drive. Steve Wilson, [the Petitioner]'s brother, greeted them at the door and [the Petitioner] informed him that he had killed Timbo. Then, [the Petitioner] and his brother went into the house and [the Petitioner] reappeared in different clothing and a blue lumber jacket. Mr. Garcia further testified that [the Petitioner] showed him what appeared to be a "chunk" of money. [The Petitioner] then took the money and a package from the trunk and carried both into his brother's house. Mr. Garcia stated that [the Petitioner] later bragged that he had "hit for two G's," meaning two thousand dollars. When [the Petitioner] left his brother's house, he drove to Shelby Park where he backed his car up and unloaded the remaining bullets from the revolver. Mr. Garcia testified that he watched as [the Petitioner] threw the revolver and the bullets into the Cumberland River. [The Petitioner] then drove to the home of his girlfriend, Toni Avant, where he went inside. After waiting in the car for a couple of minutes, Mr. Garcia knocked on the door and asked [the Petitioner] to leave. He stated that on their way home, [the Petitioner] drove down a street that was parallel to Oneida, looking for signs of police activity. Seeing no police cars, [the Petitioner] took Mr. Garcia home. When Mr.

7

Garcia returned home, he told his girlfriend what had happened and then went to sleep.  He stated that [the Petitioner] called early the next morning and told him to turn on the news to watch the story of Timbo's murder.

Mr. Garcia further testified that he and [the Petitioner] talked about the events on the night of the homicide every day for several months.  [The Petitioner] told Mr. Garcia that on November 13, 1997, he called Timbo to purchase some marijuana.  According to their agreement, Timbo would leave a quarter bag of marijuana in the mailbox and [the Petitioner] would pick it up, and leave the money for the marijuana in the mailbox.  However, [the Petitioner] decided to go to Timbo's door, and after identifying himself, Timbo opened the door.  While Timbo was breaking off some marijuana from a brick, [the Petitioner] took out his gun and demanded Timbo's money.  Timbo led [the Petitioner] into one of the bedrooms and gave [the Petitioner] a "bunch of money."  While Timbo was giving [the Petitioner] the money, Timbo kept smiling and saying, "you can have it, you can have it."  [The Petitioner] replied, "I know I can have it."  [The Petitioner] then ordered Timbo to get on the ground, but when Timbo tried to run away [the Petitioner] shot him in the back of the head three times.  [The Petitioner] described in detail that "the blood came out of his head like a water faucet, like a water fountain . . . ."  [The Petitioner] then ran from the victim's house, but stopped beside a vehicle in Timbo's front yard when he saw that Michael Holt was arriving home.  As he watched Michael Holt, Timbo's neighbor, an older lady, spoke to him.  [The Petitioner] stated that although he responded to her, he never took his eyes off Michael Holt's home.

Mr. Garcia further testified that [the Petitioner] confided that the gun he had used to kill Timbo belonged to Terry Fisher (also known as Mug).  On November 13, 1997, [the Petitioner] retrieved this gun that Mug stored in a car behind his mother's house.  [The Petitioner] further admitted to Mr. Garcia that he needed money quickly because he had a "real bad dope case pending" and he was expecting a new baby's arrival.  Mr. Garcia stated that [the Petitioner] told him that he had spent between $500.00 to $700.00 on lay-away items for the baby, and had paid his lawyer $1000.00.  [The Petitioner] also stated that he sold the marijuana recovered from the victim to Daryl Haley.  Mr. Garcia testified that he was present when Daryl Haley saw [the Petitioner] at Tim Burke's pawn shop approximately a week after the murder and asked [the Petitioner], "[w]hy you sold me that dead man's weed?"  He then witnessed [the Petitioner] grab Mr. Haley and rush him out the back door.  [The Petitioner] told Mr. Garcia that after the murder, he

gave the black leather coat to Marlin Thompson to get it out of his possession. Mr. Garcia acknowledged that although he knew [the Petitioner] had murdered Timbo, he continued to remain friends, spent time with him, and even double-dated a couple of times.

In August of 1998, Mr. Garcia surrendered to authorities due to a probation violation warrant and was incarcerated until the middle of September. He testified that the day before his release, [the Petitioner] stole his car. Although Mr. Garcia reported the auto theft to police, he did not mention the murder. Shortly thereafter, [the Petitioner] began making threatening calls to Ms. Walker's home, where Mr. Garcia was living. Mr. Garcia stated that [the Petitioner] threatened to kill him and his family because [the Petitioner] feared that Mr. Garcia had contacted the police about the murder. In the calls, [the Petitioner] referred to him as a "police ass n-----" and a "snitch." Mr. Garcia testified that five of the calls were recorded on his girlfriend's answering machine. The tapes of the calls were played for the jury during the trial. Mr. Garcia admitted that a portion of these calls were related to property that he had in his possession, which belonged to [the Petitioner]. Mr. Garcia testified that several days after the phone calls began, [the Petitioner] drove into his yard and pointed a pistol at him. Frightened by [the Petitioner]'s actions and the threats, Mr. Garcia spoke to his lawyer and then went to police. He testified that he was never promised anything in exchange for his testimony.

Daryl Haley, whose step-son Marlin Thompson was [the Petitioner]'s friend, testified that a few days after the victim was shot, he purchased almost two ounces of marijuana from [the Petitioner] for approximately $125.00. He stated that this price was a bargain because an ounce of marijuana normally sold for $100.00. He added that they completed the transaction at Mr. Haley's home, and that during the sale he inquired, "this isn't any-that dead man's weed?" [The Petitioner] claimed that he had traded a gun for the marijuana. Mr. Haley later reported this transaction to police. Contrary to Mr. Garcia's testimony, he denied having made the statement in any other location.

Toni Avant testified that she dated [the Petitioner] in November 1997. On November 13, 1997, she went riding with [the Petitioner], Marlon Thompson and Stacy Newman. She remembered that [the Petitioner] was wearing a black leather coat that night, which he never wore after that date. After riding around Shelby Park, they returned home at approximately 5:30 p.m. She then walked with [the Petitioner] to his

9

mother's home to retrieve a gun for Mug, which was stored in a car behind the home. When they returned to her home, [the Petitioner] placed a phone call and then left. Later that evening, between 10:30 and 11:30 p.m., [the Petitioner] returned to her home heavily intoxicated. It appeared that he had been drinking heavily and taking Valiums. Within minutes of [the Petitioner]'s arrival, Mr. Garcia knocked on the door and [the Petitioner] left again. However, before he came back, [the Petitioner] called her from a pay phone. The next morning, she woke [the Petitioner] and told him about the news report of Timbo's murder. She recalled that [the Petitioner] called Mr. Garcia during the news broadcast. Ms. Avant testified that after Timbo's murder, [the Petitioner] wore a bullet proof vest for a couple of days; he did not wear one before the murder. Ms. Avant further testified that shortly before Timbo's murder, [the Petitioner] stated that he needed money to cover attorney fees and pay a lay-away at Kmart that was about five or six hundred dollars. After the murder, [the Petitioner] gave her a receipt showing that the Kmart lay-away was paid off. However, the receipt was misplaced before trial. During her direct testimony, she admitted that when interviewed by detectives in November and December 1997, she lied and stated that [the Petitioner] was with her the entire night of November 13, 1997. However, Ms. Avant testified that the statement she provided detectives in September of 1998 was accurate, and that her testimony at trial was true.

Detective Pat Postiglione of the Metro Murder Squad Unit was the lead investigator in the victim's murder. Detective Postiglione testified that during his initial investigation he interviewed numerous witnesses including the victim's wife, brother, and several other people. Although he promptly arrived at the Oneida residence on November 13, 1997, he was unable to find physical evidence identifying a possible suspect. After further discussion with Michael Holt, [the Petitioner]'s name, among others, arose as a possible suspect. He stated that [the Petitioner] was investigated because he regularly bought marijuana from Timbo and they often dealt in stolen equipment together. Detective Postiglione later received information from Mrs. Holt that [the Petitioner] had called Timbo the night of his murder. Detective Postiglione testified that initially, [the Petitioner] was not a suspect. However, he recalled that during the interview, [the Petitioner] appeared nervous. [The Petitioner] admitted that he and Timbo were well acquainted, but denied any involvement in the murder. [The Petitioner] also denied owning a leather jacket on November 13, 1997. [The Petitioner] claimed that on the night Timbo was murdered, he was with his girlfriend, Toni Avant. He stated that on that night, he was

not with anyone named Mike. [The Petitioner] stated that he did not hear of Timbo's murder until November 15, 1997, two days after it occurred. Detective Postiglione testified that he followed up on Ms. Carrington's statement that the man she saw was as tall as the window on the victim's Bronco. He later determined that [the Petitioner] was approximately the same height.

Detective Postiglione stated that the investigation was stagnant until Michael Garcia approached him in 1998. In September of 1998, Wayne Davis, Mr. Garcia's attorney, contacted the district attorney's office and reported that Mr. Garcia might have some possible information about the victim's murder. When interviewed, Mr. Garcia admitted that he was afraid that [the Petitioner] might harm him or his family. After Mr. Garcia gave a statement to police, Detective Postiglione investigated the facts and confirmed details provided by Mr. Garcia. Mr. Garcia also took Detective Postiglione to the location where [the Petitioner] disposed of the weapon and identified the home belonging to [the Petitioner]'s brother on Riverside Drive. Detective Postiglione testified that Mr. Garcia also provided information about the marijuana sale, which led them to Daryl Haley. Detective Postiglione testified that the information given by Mr. Garcia was corroborated through further investigations and the statements of additional witnesses. Detective Postiglione also stated that Mr. Garcia was not promised anything in exchange for his cooperation. Detective Postiglione testified that the following information was not released to the public: the location of the bullet wounds, the number of wounds, the type of bullet used, the amount of marijuana stolen, the amount of blood the victim lost, and the fact that the suspect possibly wore a black leather coat. Subsequently, [the Petitioner] was arrested and charged with the murder.

Although scuba divers searched the Cumberland River in 1998, they were unable to recover the revolver and bullets that [the Petitioner] had purportedly thrown into the river in November of 1997. . . .

Detective Damion Huggins of the Metro Vice Division testified that [the Petitioner] contacted him on October 8, 1998, to give a statement about Timbo's murder. [The Petitioner] was familiar with Detective Huggins because Detective Huggins formerly worked as a uniformed officer in the housing projects. After Detective Huggins administered "Miranda warnings," [the Petitioner] waived these rights and gave the following statement that Detective Huggins transmitted to written form:

11

> [The Petitioner] told me, (Officer Huggins), that on the
> night of Timothy Holt's murder, a girl named, Toni, himself,
> Marlin Thompson and a girl named Staci all went out to eat.
> After eating, [the Petitioner] had a lot to drink and took some
> Valiums.  He said they all went to Toni's apartment at 619 S.
> 7th St and went to sleep.  Prior to going to sleep [the
> Petitioner] and Toni went to James's mother's residence and
> [the Petitioner] put some pills and cash into a Cadillac parked
> in the rear of the house, 601 S. 9th St. [the Petitioner] then
> states Mike Garcia came to 619 S. 7th Street to get him to
> ride around.  Toni's mother at 619 S. 7th Street answered the
> door.  [The Petitioner] rode around with Mike Garcia and
> they stopped by Garcia's home, but, James was tired and
> stayed inside the car. (They were in M. Garcia's Chevy
> Caprice, red in color.)  M. Garcia came out and took James
> Wilson back to 619 S. 7th Street.  [The Petitioner] said he
> then heard about the murder at work at the pawn shop the
> next day.  [The Petitioner] says that he had heard rumors
> about the wife of T. Holt and her boyfriend and insurance
> money as possible motive.  [The Petitioner] claims his
> innocence.

*James Robert Wilson*, 2002 WL 1050259, at \*1-9.

After presenting this evidence, the State rested its case.  The Petitioner offered evidence from his brother, who refuted Mr. Garcia's account of the night of the murder. The Petitioner also testified, confirming his statement.  The Petitioner added that he had loaned his gun to Mr. Garcia, who never returned the weapon to him and gave him marijuana in lieu of the weapon.  The Petitioner said he sold the marijuana to Mr. Haley, but, when Mr. Haley asked him if it was the "dead man's" marijuana, the Petitioner began to suspect that Mr. Garcia had killed the victim.

The Petitioner denied wearing the black leather coat to the pawn shop and said he let someone borrow the jacket.  He said that he and Mr. Garcia became angry with each other after Mr. Garcia refused to return a valuable gun that the Petitioner had stored at Mr. Garcia's home.  George Duzane testified that he represented Petitioner in 1998 on a drug charge. He stated that Petitioner never paid him a lump sum of $1,000.00 in 1997 or 1998.  Instead, he produced receipts in court showing that Petitioner only paid him $250.00, and later, $500.00 towards legal fees.

12

Edward Bell testified that in November of 1997, he lived on Prince Street and knew Timbo from the neighborhood. At the time of the trial, Mr. Bell was eighteen years old and a senior at Maplewood High School. He stated that on the night that Timbo was murdered, he was "hanging out" on Joy Circle, two streets away from Oneida, when he heard four or five gunshots. He then saw Bushrod running across the street wearing a black bullet proof vest. He testified that Bushrod also had a .357 in his hand. He stated that he was able to identify the weapon as a .357 because of its long barrel and brown handle. He remembered that Bushrod was breathing heavily as he ran past them on the opposite side of the street. He stated that in March 1998, he called the victim's mother-in-law, Ms. Vivian Chapman, and relayed these facts. He stated that although he was contacted by police, he refused to provide a statement because he was afraid of Bushrod.

In rebuttal, the State offered the testimony of Ms. Vivian Chapman, the victim's mother-in-law. She corroborated Mr. Bell's statement that he contacted her in March of 1998 about her son-in-law's murder. However, she stated that Mr. Bell only told her that Bushrod was wearing a bullet proof vest and that he had a gun. Although she encouraged Mr. Bell to report this information to police, she testified that he was reluctant to get involved.

Based upon this evidence, the jury convicted the Petitioner of especially aggravated robbery and first degree felony murder. *Id.* at *10. The trial court sentenced him to an effective sentence of life. The Petitioner appealed, contending *inter alia* that the trial court erred when it failed to instruct the jury on second degree murder instead of reckless homicide and criminally negligent homicide as lesser-included offenses of felony murder. *Id.* at *18. This Court affirmed his convictions. *Id.* at *1.

In 2003, the Petitioner unsuccessfully sought post-conviction relief on the basis that he had received the ineffective assistance of counsel. *Wilson*, 2005 WL 1378770, at *1. The post-conviction court dismissed his petition, and this Court affirmed. *Id.*

The Petitioner then filed a petition for writ of habeas corpus contending that his judgment for felony first degree murder is void because the trial court amended count one of the indictment over his objection. The indictment, based upon a 1995 statute, read:

> Count 1: The Grand Jurors of Davidson County, Tennessee, duly impaneled and sworn, upon their oath, present that: JAMES ROBERT WILSON on the 14th day of November, 1997, in Davidson County, Tennessee and before the finding of this indictment, recklessly did kill Timothy Wayne Holt, during the perpetration of or attempt to perpetrate robbery, in violation of Tennessee Code Annotated § 39-13-202, and against the peace and dignity of the State of Tennessee.

13

The Petitioner asserted at trial that the indictment did not charge first degree felony murder because it included that the murder was committed "recklessly." The trial court held that the term "reckless[]" was "surplusage," and it amended the indictment by striking that term. The trial court then instructed the jury using the current first degree murder statute, which did not include the term reckless. In his petition for habeas corpus relief, the Petitioner asserts that the trial court constructively amended the indictment without the Petitioner's consent and thereby was without jurisdiction to enter the judgment of conviction.

The habeas corpus court summarily dismissed the petition. It found:

> The petitioner alleges that he is entitled to relief because "[t]he trial court constructively amended the indictment in this case over the petitioner's objection when the court failed to charge the jury in the language utilized by the Grand Jury when they returned the indictment and when the Court instructed the jury in a manner which deleted language utilized to return the indictment by the Grand Jury."
>
> Article I, § 15 of the Tennessee Constitution guarantees the right to seek habeas corpus relief and Tennessee Code Annotated § 29-21-101 et seq. codifies the applicable procedures for seeking a writ. While there is no statutory time limit in which to file for habeas corpus relief, Tennessee law provides very narrow grounds upon which such relief may be granted. A habeas corpus petition may only be used only to contest void judgments which are facially invalid because" (1) the convicting court was without jurisdiction or authority to sentence a Petitioner; or (2) Petitioner's sentence has expired. The Court finds that none of the habeas corpus grounds are present in the petition. The Court has reviewed the issue raised and is of the opinion that the petition contains no grounds that establish that this Court was without jurisdiction or authority to sentence the petitioner in the instant case. Therefore, the petition is denied.

It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that when the trial court amended the indictment without his permission, it was divested of jurisdiction to enter a judgment of conviction against him. He asserts that the trial court's instructions to the jury omitted an element of the indicted offense, which entitles him to a reversal of his conviction. The

14

State counters, first, that the Petitioner failed to follow the mandatory procedure of the habeas corpus statute by failing to file his habeas corpus petition in the proper court. It further notes that in the Petitioner's direct appeal, he argued that the trial court erred when it instructed the jury on the lesser-included charge of second degree murder rather than reckless homicide. The State recounts that, addressing that argument on direct appeal, this Court held, "that the 'reckless' language contained in the indictment was surplusage, and its use cannot change the essential elements of the offense." *James Robert Wilson,* 2002 WL 1050259, at *18.

Article I, section 15 of the Tennessee Constitution guarantees the right to seek habeas corpus relief. *See Faulkner v. State*, 226 S.W.3d 358, 361 (Tenn. 2007). Although the right is guaranteed in the Tennessee Constitution, the right is governed by statute. T.C.A. §§ 29-21-101,-130 (2014). The determination of whether habeas corpus relief should be granted is a question of law and is accordingly given de novo review with no presumption of correctness given to the findings and conclusions of the court below. *Smith v. Lewis*, 202 S.W.3d 124, 127 (Tenn. 2006) (citation omitted); *Hart v. State*, 21 S.W.3d 901, 903 (Tenn. 2000). Although there is no statutory limit preventing a habeas corpus petition, the grounds upon which relief can be granted are very narrow. *Taylor v. State*, 995 S.W.2d 78, 83 (Tenn. 1999).

It is the petitioner's burden to demonstrate by a preponderance of the evidence that "the sentence is void or that the confinement is illegal." *Wyatt v. State*, 24 S.W.3d 319, 322 (Tenn. 2000). In other words, the very narrow grounds upon which a habeas corpus petition can be based are as follows: (1) a claim there was a void judgment which was facially invalid because the convicting court was without jurisdiction or authority to sentence the Petitioner; or (2) a claim the Petitioner's sentence has expired. *Stephenson v. Carlton*, 28 S.W.3d 910, 911 (Tenn. 2000); *Archer v. State*, 851 S.W.2d 157, 164 (Tenn. 1993). "An illegal sentence, one whose imposition directly contravenes a statute, is considered void and may be set aside at any time." *May v. Carlton*, 245 S.W.3d 340, 344 (Tenn. 2008) (citing *State v. Burkhart*, 566 S.W.2d 871, 873 (Tenn. 1978)). In contrast, a voidable judgment or sentence is "one which is facially valid and requires the introduction of proof beyond the face of the record or judgment to establish its invalidity." *Taylor*, 995 S.W.2d at 83 (citations omitted); *see State v. Ritchie*, 20 S.W.3d 624, 633 (Tenn. 2000). The petitioner bears the burden of showing, by a preponderance of the evidence, that the conviction is void or that the prison term has expired. *Passarella v. State*, 891 S.W.2d 619, 627 (Tenn. Crim. App. 1994). Furthermore, the procedural requirements for habeas corpus relief are mandatory and must be scrupulously followed. *Summers v. State*, 212 S.W.3d 251, 260 (Tenn. 2007); *Archer*, 851 S.W.2d at 165.

We first note that the State is correct that the Petitioner did not follow the mandatory procedures articulated by the habeas corpus statute. The Petitioner is

incarcerated in Hickman County, but he filed his petition in Davidson County, which is not the court that is the "most convenient in point of distance" to him. Procedurally, we note that the failure to file a petition for a writ of habeas corpus in the county of incarceration, absent a sufficient reason for not doing so, is a proper basis for the dismissal of the petition. T.C.A. § 29-21-105. If a petition states a reason explaining why it was filed in a court other than the one nearest to the petitioner, the petition may be dismissed pursuant to this section only if the stated reason is insufficient. *Davis v. State*, 261 S.W.3d 16, 21 (Tenn. Crim. App. 2008). In *Davis*, the Court concluded that "the fact that the convicting court possesses relevant records and retains the authority to correct an illegal sentence at any time is a sufficient reason under Tennessee Code Annotated section 29-21-105 for the petitioner to file in the convicting court rather than the court closest in point of distance." *Id*. at 22.

In this case the Petitioner failed to offer a reason why he filed his petition in the convicting court rather than in the court closest in point of distance. The habeas corpus court could have properly dismissed his petition on those grounds. It, however, did not and addressed the petition on its merits. In the interest of judicial economy, we will also address the Petitioner's claim on its merits.

The habeas corpus court found that there was no basis for the writ of habeas corpus because the Petitioner's judgments were not void. We conclude that the Petitioner has not met his burden of establishing that his judgments are void or that his sentences have expired. This Court held on direct appeal that the "reckless" language in the indictment was surplusage and that the indictment was not defective. *See James Robert Wilson*, 2002 WL 1050259, at *18. Furthermore, the Petitioner's claims on appeal are not a cognizable ground for habeas corpus relief. See *Stephen Lujan Beasley v. State*, E2005-00367-CCA-R3-HC, 2005 WL 3533265, at *4 (Tenn. Crim. App., Knoxville, Dec. 27, 2005) (holding that the petitioner's allegations that the state constructively amended the indictment by presenting proof that the petitioner was guilty of felony murder in addition to proof that he was guilty of premeditated murder did not presents a cognizable ground for habeas corpus relief), *perm app. denied* (Tenn. May 30, 2006). Accordingly, we conclude that the trial court properly dismissed the petition. The Petitioner is not entitled to habeas corpus relief.

### III. Conclusion

After a thorough review of the record and relevant authorities, we affirm the habeas corpus court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

16